# Oden *et al. v.* Dupuy, *et al.*

*Bill in Equity to remove Cloud from Title, and to quiet Title to Land.*

1. *Sale under decree of Probate Court; estoppel.*—When lands are sold under a decree of the Probate Court, and the purchase-money is received by the administrator, and accounted for in his administration, the sale, in a court of equity, will be treated as valid, and the parties estopped from impeaching it.
xcix.

[Oden et al. v. Dupuy et al.]

2. *Same.*—One who has received and retains the proceeds of property sold, even though sold without authority, is estopped from claiming the property itself. To receive and retain the proceeds is a ratification of the unauthorized sale.

APPEAL from the Chancery Court of Jefferson.

Heard before the Hon. THOMAS COBBS.

The bill in the present case was filed May 29, 1889, by the brothers and sisters, heirs-at-law, of James M. Ware, deceased, and it makes defendants the descendants of Mrs. Dupuy and of William S. Mudd, the remaining heirs at law of James A. Mudd, deceased. The avowed purpose of the bill is to remove a cloud from James M. Mudd's title to certain land, described in the bill of complaint, as the S. W. ¼ of the S. E. ¼ of Section 27, Township 17, Range 3 West.

The facts of the case are sufficiently stated in the opinion. Upon the final submission of the cause, on the pleadings and proof, the chancellor decreed that the complainants were not entitled to the relief prayed for, and ordered that their bill be dismissed. The present appeal is prosecuted by the complainants, and the chancellor's final decree is assigned as error.

HEWITT, WALKER & PORTER, for appellants.—(1.) In construing the petition for sale to the Probate Court, the same rules of construction apply as in construing deeds and wills. Under the facts of the case, the effect of describing the lands as the "Anderson Place," was to include the 40 acre tract involved in this controversy.—*Kimbrell v. Rogers,* 90 Ala. 339; *Liks v. Ratchford,* 88 Ala. 397; *O'Neal v. Seixas,* 85 Ala. 80; *Wright v. Wright,* 34 Ala. 194; 2 Dev. on Deeds, §§ 1013-1017, 1038-1040. (2.) The complainants were entitled to the relief prayed for.—*Bell v. Craig,* 52 Ala. 215; *Robertson v. Bradford,* 73 Ala. 116. (3.) Parties can not act upon and adopt such parts of a transaction as may be favorable and beneficial to themselves, and, at the same time, repudiate it so far as it may involve them in corresponding duties to others. (4.) The complainants had acquired title by right of adverse possession.—*Duncan v. Williams,* 89 Ala. 341; *L. & N. R. R. Co. v. Philyaw,* 88 Ala. 267; *Woodstock Iron Co. v. Roberts,* 87 Ala. 436; *Bozeman v. Bozeman,* 83 Ala. 416; *Burks v. Mitchell,* 78 Ala. 61.

GARRETT & UNDERWOOD, *contra.*—(1.) A court of equity in this State has no jurisdiction to review or correct the proceedings of the Probate Courts of this State, for the sale of lands of estates of decedents, for division, except such as is conferred expressly by statute.—*Ganey v. Sikes,* 76 Ala. 421; *Lowe v. Guice,* 69 Ala. 80. (2.) The com-

plainants in this cause have no right to claim the interference of a court of equity to remove a cloud on the title, or to quiet the title.—*Orton v. Smith,* 18 How. 263 ; *Ward v. Chamberlain,* 2 Black. 430, 444; *West v. Schnebley,* 54 Ill. 523 ; *Huntington v. Allen,* 44 Miss. 654 ; *Stark v. Starrs,* 6 Wall. 402 ; *Meloy v. Dougherty,* 16 Wis. 269 ; *Phelps v. Harris,* 101 U. S. 374-5 ; *Phelps v. Harris,* 51 Miss. 789 ; *Banks v. Evans,* 10 Sm. and Marsh, 35 ; *Fontaine v. Hudson,* 93 Mo. 62 ; 3 Am. St. Rep. 520. (3.) The Probate Court could not make a valid order for the sale of the 40 acre tract of land in controversy. The power to decree a sale by said court is limited to the lands accurately described in the petition.—*Fielder v. Childs,* 73 Ala. 567 ; *Gilchrist v. Shackelford,* 72 Ala. 7 ; *Cruikshank v. Luttrell,* 67 Ala. 318; *Tyson v. Brown,* 64 Ala. 244 ; *Bland v. Bowie,* 53 Ala. 152. (4.) The sale of the said 40 acre tract can not be proved by parol. It being a judicial sale, it can be proven only by the record of the court.—*Deslonde & James v. Darrington's Heirs,* 29 Ala. 92 ; *Dugger v. Tayloe,* 46 Ala. 320 ; *Lanford v. Dunklin, et al.,* 71 Ala. 605 and 606 ; *Comer v. Hart,* 79 Ala. 394. (5.) The complainants did not show title by possession adverse to the defendants, under the statute of limitations.—*Jones v. Pelham,* 84 Ala. 209 ; *Bishop v. Truett,* 85 Ala. 376; *Dothard v. Denson,* 72 Ala. 545; *Casey v. Morgan,* 67 Ala. 445 ; *Boykin v. Smith,* 65 Ala. 300 ; *Tayloe v. Dugger,* 66 Ala. 447 ; *Collins v. Johnson,* 67 Ala. 304 ; *Doe v. Hardy,* 52 Ala. 297 ; 3 Brick. Dig., 17, § 23.

STONE, C. J.—James A. Mudd, died intestate prior to 1868—probably about 1863. He had never been married, and left no lineal descendants. His next of kin, heirs at law, were his brother, William S. Mudd, his sister, Susan S. Dupuy, and James M. Ware and his brothers and sisters, children of Mary J. Ware, a sister of James A. Mudd— she having died before the proceedings after noticed were instituted. William S. Mudd, became the duly appointed administrator of James A. Mudd deceased.

When James A. Mudd, died he owned and resided on a farm, or plantation near the site on which the city of Birmingham was afterwards founded and built up. It consisted of seven hundred or more acres, and was made up of several smaller holdings. He also owned lands, or an interest in them, which lie in the coal or mineral regions, some miles away. The farm or home place was in sections 25, 26 and 35, township 17 and range 3 west, and was made up of what were in part known as the "Anderson

Place" and the "Lacey Place," so called from former proprietorship, and each of these places contained about 240 acres; 200 acres of the "Anderson Place" lying in section 35, and the remaining 40 lying in section 26, but adjoining that in section 35. The residence of James A. Mudd, at the time of his death, was in section 35, but near to the line which separates it from section 26, which lies immediately north of it; said adjoining part of 26 being the subject of contention in this suit. The fruit orchard, used in connection with the residence, extended into and included a part of the contested forty acre block in 26. James M. Ware resided with his uncle James A. Mudd, at the latter's death, and continued to occupy the premises until the sale after noticed.

In 1868, William S. Mudd, as the administrator of James A. Mudd, deceased, filed a petition in the Probate Court praying an order of sale of the lands of intestate, "for the purpose of distribution and division among the heirs." The order was obtained, and on January 4, 1869, the lands of the home place were sold, the sale reported and confirmed, purchase-money reported paid, and title to purchasers ordered to be made. No imperfection or irregularity is complained of, or' perceived in any of these proceedings, except as to the forty acres to be considered further on. About 1873, Wm. S. Mudd, Admr., made a title to Ware, the purchaser; but for some unexplained reason it was never put on record until some fifteen years afterwards. There is complaint that this deed was tampered with.

In the petition for the order of sale is this language: "Lands lying, being and situate in Jefferson county, viz: the W. $\frac{1}{2}$ of the N. E. $\frac{1}{4}$; E. $\frac{1}{2}$ of N. W. $\frac{1}{4}$, and N. E. $\frac{1}{4}$ of S. W. $\frac{1}{4}$ of section 35, township 17, range 3 west, known as the 'Anderson place.'" This is an accurate and full description of the sub-tract known as the "Anderson Place," except that it omits one 40 acre subdivision—the S. W. $\frac{1}{4}$ of the S. E. $\frac{1}{4}$ of section 26. The same omission is found in the report of sale, and in the order to make title. The other sub-tracts which go to make up the James A. Mudd home place, viz, the "Lacey Place" and the "Wilcox Place," are accurately and fully described in all the proceedings, and no dispute or contention is raised about any of the lands, except the said S. W. $\frac{1}{4}$ of the S. E. $\frac{1}{4}$ of section 26. One copy of the deed from William S. Mudd to James M. Ware does contain the said disputed 40; but the proof of its accuracy is not very satisfactory. The forty acre tract, which is in controversy in this suit, is not mentioned in any of the pro-

ceedings anterior to the making of title by the administrator to James M. Ware, and much doubt is left whether it was originally embraced in that instrument.

William S. Mudd died about 1884, Susan S. Dupuy, about 1887, and James M. Ware, in 1888; the latter intestate. The present bill was filed May 29, 1889, by the brothers and sisters, heirs at law, of James M. Ware, deceased; and it makes defendants the descendants of Mrs. Dupuy and William S. Mudd, the remaining heirs at law of James A. Mudd, deceased. The avowed purpose of the bill is to remove a cloud from James M. Ware's title to the south-west quarter of the south-east quarter of section 26, township 17,·range 3 west. The bill and pleadings are so framed, however, that if complainants are equitably entitled to the land, they can obtain the proper relief.

A great deal of testimony has been taken in this cause, and much the larger part of it by the complainants. The transcript furnishes evidence that the witnesses are above the average of intelligence, and we discover very little evidence of bias. Some testimony was objected to, and is illegal. We will disregard all illegal testimony, but will not point it out. Nor will we attempt to collate the testimony, but will content ourselves with stating the facts we think it establishes.

James M. Ware was living with his uncle James A. Mudd at the time of the latter's death, and continued to reside there until his own death in 1888. William S. Mudd resided in less than two miles of the premises, and Mrs. Dupuy also resided in the neighborhood. These two next of kin of James A. Mudd were near to and familiar with what was done by Ware, (the latter visited him), and were of necessity acquainted with his occupation of the "Anderson Place," and the nature of his possession and occupation. Ware's possession, control and dominion over the forty acres in dispute were substantially the same as the authority he exercised over that part of the "Anderson Place" which is in section 35; and this continued from the time of the sale, January 4, 1869, until his death in 1888, only a little less than twenty years. His possession and acts were not of such character as those ordinarily exercised by a mere tenant in common. They spoke the language of asserted ownership. While in possession he claimed to own the entire place.

Another view, which is established with equal clearness by the testimony. When the land was offered for sale it was not by government numbers, nor by the acre. It was

xcix.

[Oden et al. v. Dupey et al.]

offered by the sub-tracts, as known and classified by James A. Mudd in his life-time; the "Anderson Place," the "Lacey Place," the "Wilcox Place." These several bodies were bid for and purchased, not at so much per acre, but at a gross sum for the sub-tract. And the administrator's report of sale was made in the same way; in each case, a gross sum for the sub-tract.

The testimony tends very strongly to show that the forty acres in dispute were of small value for agricultural uses, and there is no proof that it was mineral or coal land. The forty acres in dispute is touched on two sides by other parts of the Mudd tract, and there is no attempt to explain, or to show any reason for withholding the said 40 acres from sale when the balance of the farm or plantation was sold. And the proof is irresistible that Judge Mudd, the administrator, never set up claim to that forty, or to any other part of the home farm, after the sale in January, 1869. On the contrary, it is fully proved that he frequently said the estate of James A. Mudd owned no lands except the mineral, or coal lands (several miles away), and a lot in Elyton.

A still more emphatic act. William S. Mudd was a stockholder and director in the Elyton Land Company. After that company had laid off and established the city of Birmingham, it purchased back from James M. Ware a part of the said disputed forty acres, and made it a part of that company's city property.

There is proof that William S. Mudd, as administrator, received the entire amount of the purchase-money bid by James M. Ware. This is proved by his report. There is also proof that he distributed it among the next of kin of intestate, and there is no attempt to prove the contrary. We feel we are on safe ground when we announce our conviction, that every dollar bid by James M. Ware was collected by the administrator, and accounted for and distributed among the proper heirs of James A. Mudd.

We summarize our conclusions of fact as follows: The "Anderson Place," at the death of James A. Mudd, comprised 240 acres—200 being in section 35, and the remaining 40 being the S. W. ¼ of S. E. ¼ of section 26. In the petition for an order to sell the lands for distribution, all the subdivisions which go to make up the "Anderson Place" are given and described, except said forty acre block in section 26. This is entirely omitted. And the same omission occurs in the report of sale. When the sale came off the "Anderson Place" was offered, not by numbers, nor by the acre, but as a sub-tract, the "Anderson Place." And it was bid for and

purchased in the same way—as the "Anderson Place"—for the gross sum of three thousand dollars. So far as the acts of offering, bidding and knocking down were concerned, the sale was of the entire "Anderson Place," including the disputed 40 acres in section 26. William S. Mudd, the administrator, intended to sell, and thought he was selling the entire tract—the "Anderson Place"—and James M. Ware intended to purchase, and thought he was purchasing the entire "Anderson Place." And both seller and buyer had the same impression and belief when the purchase-money was paid, received and distributed. The entire testimony forces the conviction upon us that each of them remained of this mind so long as they severally lived. We can not be more specific in the matter of their several intentions and beliefs, for death had sealed their lips before the imperfection in the proceedings became a subject of inquiry, so far as the record informs us. After the purchase, James M. Ware exercised the same control, the same acts of ownership over the disputed forty acres as he did over the rest of the tract. During all the time he paid the taxes on the entire tract.

The present litigation does not appear to be prosecuted between the Wares, next of kin of James M. Ware on the one side, and all the other next of kin of James A. Mudd on the other. The descendants of William S. Mudd, the administrator who made the sale, do not appear to take part in the defense of this suit. Only the descendants of Mrs. Dupuy are active defendants in the present case.

We feel justified in referring to another fact as shedding light on the probabilities which present themselves, in considering the disputed question of fact now before us. If there be merit in the contention that James M. Ware did not purchase and become the owner of the forty acre tract in dispute, then his asserted entire ownership of it, his exclusive use of it, were wrongful from the beginning. Why did William S. Mudd and Mrs. Dupuy permit him to remain in the exclusive possession and enjoyment of it during all the years, if each of them was the owner of an undivided third of it? Why, when the magic growth of Birmingham was increasing by an hundred fold the value of lands that lay near, did they not assert their rights in this property, if they felt they owned such interest?

In *Bell v. Craig*, 52 Ala. 215—opinion by Brickell, C. J.— the question was whether title to the lands had passed by an administrator's sale and conveyance. There had been a final settlement of the administration, and the report of the case recites "that said administrator in chief was paid for
xcix.

[Oden et al. v. Dupuy et al.]

said lands in full, and the purchase-money was applied by him to payment of the debts due by the estate." The administrator *de bonis non* contended that the sale was void and did not devest the title; and he was attempttng to make a second sale under an order obtained by him. The second sale was enjoined by an appellate order of this court. We copy from the opinion of this court as follows: "It appears that the administrator in chief made a final settlement of his administration, to which the appellee, as administrator *de bonis non,* was a party. On this settlement, the purchase-money received by the administrator in chief for the lots in controversy was charged against him, and accounted for fully. · · · It would be unjust to permit him [the administrator *de bonis non*] now, after having treated the purchase-money as assets, suffered them charged against the administrator in chief, and after all who have interests in the estate have received all the benefit which could accrue from a regular and valid sale, to treat the sale as void. It would operate a fraud on the purchaser which can not be tolerated. · Those who have interests in the estate would receive compensation for the lands a second time, at the expense of a purchaser whose good faith is not impugned. Whenever lands are sold under a decree of the court of probate, and the purchase-money is received by the administrator, and accounted for in the settlement of his administration, the sale, in a court of equity, will be treated as valid, and the parties estopped from impeaching it."

In *Pickens v. Yarbrough,* 30 Ala. 408-10, the court employed this language: "Upon the case as presented, the complainant has, by his proceedings in the Orphan's Court, obtained a decree for his *pro rata* share of the assets, part of which arose from the sale of the lands. He must be presumed to have done this knowingly, for he does not aver or pretend that he did it ignorantly. He has collected part of his decree; and yet, thus retaining the benefit of that decree, and of the money collected on it, he seeks also to subject the lands to the payment of his demand. In other words, he has knowingly taken his share of the benefit of the proceeds of the sale of the lands, and, retaining that benefit, he wishes to set aside that sale for fraud, and get another benefit from having the lands sold again. He can not do this. He can not assail the sale for fraud, after having knowingly obtained a decree which treated the proceeds of that sale as assets of the estate." ·

In *Bland v. Bowie,* 53 Ala. 152, 161-2, it was said: "If the proceedings are void, they may elect to confirm them, and ·

by conveyance vest in the purchaser all the interest he could have acquired by proceedings strictly conforming to the law. · · If the purchase-money has been paid and distributed to the heirs, or applied by the personal representative to the payment of debts, a court of equity would compel a conveyance of title from the heirs, if they could not successfully impeach the fairness of the sale."

In *Goodman v. Winter*, 64 Ala. 410, 434, this court said: "It is a plain principle of justice, of right and of law, that a man can not accept the benefits and reject the burdens of a transaction." In *Robertson v. Bradford*, 73 Ala. 116, is this language: "There is no principle of law better settled, or resting on wiser considerations of public policy, and higher considerations of justice, than that no person, whether *sui juris* or under disability, and the character of the disability is not important, who has received and retains the fruits of a judicial proceeding, can be heard to assail it, either for irregularity or illegality, to the prejudice of others who have in good faith relied on it and acted on it as valid." See also, *Butler v. O'Brien*, 5 Ala. 316; *Firemen's Ins. Co. v. Cockran*, 27 Ala. 228; *Williamson v. Ross*, 33 Ala. 509; *Nabring v. Bank of Mobile*, 58 Ala. 204.

It may be objected, that in the cases from which we have quoted there were judicial proceedings, in which the lands in controversy were described, or so referred to as to be susceptible of identification, while in the case we have in hand, the forty acre block in controversy is no where described, either in the petition, the order of sale, or the report of sale. We answer, first, that in all the proceedings—the petition, the order of sale and in the report of sale—the "Anderson Place" is distinctly mentioned; and the proof is overwhelming that the S. W. $\frac{1}{4}$ of S. E. $\frac{1}{4}$ of section 26, township 17, range 3 west, was and is a part of the "Anderson Place;" and that in the offer of sale, the bidding and the knocking down, the land was announced and described as the "Anderson Place."

A further answer. While it is true, that in the cases reported some form of judicial proceedings had been had, and the lands in controversy were therein described or referred to, yet those proceedings were so imperfect as not to give the court jurisdiction. They were not simply erroneous and reversible, or voidable, but they were void. No significance can attach to a void judicial proceeding, for it is only the equivalent of no proceeding whatever. And the judgments pronounced were in no sense rested on the fact that there had been judicial proceedings. It was raised to the

[Oden et al. v. Dupuy et al.]

higher equitable plane, that having partaken of the fruits of the unauthorized sale, the claimants would not be permitted to retain those fruits, and, at the same time, assert title to the land itself. The claims are incompatible.—*Butler v. O'Brien*, 5 Ala. 316.

Why should the fact that some form of proceedings had been had in the cases we have cited exert any influence in the decision of this case? It was only because those former proceedings were void that the several rulings upon their effect were, or could have been invoked or made. Their nullity furnished the opportunity as well as the necessity of the rulings; for if they possessed any judicial force, the later judgments would not have been needed, nor could they have been rendered. To hold otherwise would be to declare that said former judicial proceedings must have been had, in order to constitute the subsequent payment and receipt of the money an estoppel, while at the same time they were necessarily so imperfect, so absolutely void, as to exert no influence whatever in changing the title and right to the property. Such is not the reason on which the principle rests. The true principle is that one who has received and retains the proceeds of property sold, even though sold without authority, is estopped from claiming the property itself. To receive and retain the proceeds is a ratification of the sale.

We think the testimony leaves no ground for doubt that the forty acre tract in dispute was embraced alike in the offer of sale by the administrator, and in the bid and purchase of James M. Ware; and that he paid the agreed purchase price for the whole tract. Ware, the purchaser, remained in possession and control of the property ever afterwards, until his death; near twenty years after the sale. During all this time he exercised such acts of ownership over the entire "Anderson Place" as only one who asserted ownership would exercise, while William S. Mudd and Mrs. Dupuy, the other tenants in common, though living near by, are not heard to complain of his said possession and use of the land. Conceding that there was neither petition nor order for the sale of the land, these facts take the transaction without the influence of the Alabama statute of frauds, and constitute it a valid sale.—Code of 1886, § 1732, subdiv. 5; *Shakespeare v. Alba*, 76 Ala. 351; *Martin v. Blanchett*, 77 Ala. 288.

In what we have said [we must not be understood as announcing that the generic description, "Anderson Place," dominates the specific description by government numbers,

[Oden et al. v. Dupuy et al.]

as found in the petition and other documents. The opposite is the rule. We do not affirm that the petition, the order of sale, or the report of sale, either with or without the accompanying proof, authorized or legalized the sale of the S. W. $\frac{1}{4}$ of the S. E. $\frac{1}{4}$ of section 26. We hold the contrary. What we do decide, and all we decide in this connection is, that the great weight of testimony, and the conduct of the parties under and after the sale, demonstrate as facts that in the offer to sell and actual sale by the administrator, the disputed forty acre tract was intentionally included in the offer of the "Anderson Place" for sale, and the bids and purchase were made on the same postulate, that the payment and report thereof were made on the same understanding, and that said forty acres was part of the consideration on which the three thousand dollars were promised and paid. The money being thus paid, received by the administrator and distributed among the next of kin, near or quite twenty years ago, they are estopped from claiming the land, or any interest therein. Having enjoyed their share of the proceeds of its sale, they can not be permitted, particularly after this long delay and acquiescence, to claim and recover the land itself.—*Butler v. O'Brien*, 5 Ala. 316; *Goodman v. Winter*, 64 Ala. 434.

The decree of the chancellor is reversed, and this court, proceeding to render the decree the chancellor should have rendered, doth order and decree that the title to the said forty acre tract of land, viz., the southwest quarter of the southeast quarter of section 26, township 17, range 3 west, be devested out of the heirs at law of James A. Mudd, and vested in the complainants in the present suit—Mrs. Mary E. Oden, Mrs. Mary C. Kirk, William A. Ware, Mrs. Sarah F. Allen, Susan C. Ware, Florence R. Dupuy, George W. Ware, and Mrs. Lou. Heath, in the proportion the law casts the title upon them on the death of James M. Ware intestate. But this decree is not to affect or disturb the right or title of any person or corporation to said land or any part thereof acquired from James M. Ware in his lifetime.—*Jones v. Woodstock Iron Co.*, 95 Ala. 551; 10 Southern Rep. 635.

Let the costs of the original suit be paid by complainants, and the costs of appeal by John W. Dupuy, Mrs. S. F. Wilson, Mrs. Sarah E. Parsons and Mrs. Mary J. Riley, adult heirs at law of Susan S. Dupuy, deceased.

A proper allowance to the guardian *ad litem* of the infant defendants, for the services rendered by him in the court below, is also adjudged against the complainants, as part of

[Joseph, Gaboury & Co. v. Southwark Foundry & Machine Co.]

the decree against them, by the order of this court. But inasmuch as we have no information or *data* on which to fix the proper amount of such allowance, the cause is remanded that the Chancery Court may ascertain and decree a proper allowance to the guardian *ad litem* for his said services in that court.

Reversed, rendered, and, on a single point, remanded.